IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(WHITE PLAINS DIVISION)

BISCEGLIE & ASSOCIATES, P.C.
1527 Franklin Avenue, Suite 301
Mineola, New York 11501
P: (516) 414-2900
F: (888) 688-4206
*Attorneys for Plaintiff Andrew Barcia*

| | |
|---|---|
| GEORGE PETRE,<br><br>Plaintiff,<br><br>vs.<br><br>ICE AIR, LLC and FREDRIC NADEL, individually and in his capacity as Chief Executive Officer and Chief Financial Officer of Ice Air, LLC,<br><br>Defendants. | Civil Action No.:<br><br>**COMPLAINT and<br>JURY DEMAND** |

**COMPLAINT AND JURY DEMAND**

Plaintiff George Petre ("Plaintiff" or "Petre"), by and through his attorneys, Bisceglie & Associates, P.C., files this Complaint and Jury Demand ("Complaint") against Defendants Ice Air, LLC ("Ice Air") and Fredric Nadel ("Nadel"), individually and in his official capacity as Chief Executive Officer and Chief Financial Officer of Ice Air (collectively, "Defendants"), and alleges as follows:

**NATURE OF ACTION**

1. This is a civil action seeking equitable relief and monetary damages against Defendants for engaging in unlawful employment discrimination, retaliation, and the creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq.

2. Plaintiff brings this action to redress Defendants' repeated and egregious acts of discrimination based on his religion and national origin, and their retaliation for his refusal to participate in or conceal unlawful financial activities within the company.

3. These retaliatory and discriminatory acts deprived Plaintiff of his statutory rights under federal and state law and culminated in his constructive discharge from employment. Plaintiff seeks compensatory and punitive damages, attorneys' fees, and such other relief as this Court deems just and proper.

## JURISDICTIONAL STATEMENT

4. This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331 and 1391.3. Further, this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. The Court also has jurisdiction as Plaintiff's damages exceed $75,000.00. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights. This Court has supplemental jurisdiction over any New Jersey state law claims pursuant to 28 U.S.C. § 1367.

5. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on religion and national origin. The EEOC issued a Notice of Right to Sue dated September 19, 2025, which Plaintiff received

on September 23, 2025. This action is filed within ninety (90) days of receipt of the Notice of Right to Sue. A copy of the Notice of Right to Sue is attached as **Exhibit A.**

## VENUE

6. Venue is proper in the Southern District of New York, White Plains Division, pursuant to 28 U.S.C. § 1391(b), because the acts and omissions giving rise to this action occurred in Westchester County, New York, where Plaintiff worked for Defendants. Defendant Ice Air, LLC maintains its principal place of business at 80 Hartford Avenue, Mount Vernon, New York 10553, and Defendant Nadel resides and conducts business in the same jurisdiction.

## PARTIES

7. Plaintiff George Petre ("Petre") is an individual residing at 13 Campus Place, Apt. SR, Scarsdale, New York 10583. Plaintiff was employed by Defendant Ice Air, LLC from approximately May 1, 2022 through June 3, 2024, serving as Corporate Controller.

8. Defendant Ice Air, LLC ("Ice Air") is a New York limited liability company with its principal office at 80 Hartford Avenue, Mount Vernon, New York 10553, and at all relevant times was an employer within the meaning of Title VII and the NYSHRL.

9. Defendant Fredric Nadel ("Nadel") is an individual residing at 77 Sturges Hwy., Westport, CT 06880 and served as Chief Executive Officer and Chief Financial Officer of Ice Air, LLC. At all relevant times, Nadel exercised supervisory authority over Plaintiff and was directly involved in the discriminatory, retaliatory, and harassing conduct described herein.

10. Collectively, Defendants Ice Air and Nadel are referred to as the "Defendants."

## FACTS

11. Plaintiff George Petre ("Plaintiff") began his employment with Ice Air, LLC ("Ice Air") on or about May 1, 2022, as Corporate Controller at the company's headquarters located at 80 Hartford Avenue, Mount Vernon, New York.

12. Plaintiff is a devout Romanian Orthodox Christian and an experienced financial professional with an exemplary record of integrity and performance.

13. During his tenure, Plaintiff was instrumental in securing a $17.5 million federal grant from the United States Department of Energy (DOE) under the Defense Production Act for the establishment of Ice Air's new South Carolina manufacturing facility. In public statements and official DOE materials, Defendant Fredric Nadel, the Chief Executive Officer and Chief Financial Officer of Ice Air, personally identified Plaintiff as the Project Lead and key contributor to this federally funded initiative.

14. Throughout 2023, Plaintiff's performance was repeatedly praised by Nadel, who commended him for his diligence and leadership during critical audits.

15. In a message dated March 24, 2023, Nadel wrote to Plaintiff, "You've done an excellent job with the audits... I need your help for the everyday running of the company." Plaintiff received performance bonuses and recognition consistent with his strong work history.

16. Despite this record, Plaintiff was subjected to a pattern of discriminatory harassment and retaliation at the hands of Defendant Nadel.

17. Beginning in or about late 2023, Nadel began to ridicule and demean Plaintiff's deeply held religious beliefs. Plaintiff displayed on his desk two religious icons—one depicting the Virgin Mary and another depicting Father Arsenie Papacioc, a revered Romanian Orthodox monk who was imprisoned for his faith. Nadel repeatedly mocked these sacred

items, asking, "Who is that old guy in black?" and sneering, "Do you believe in that sh*t?" When Plaintiff objected and asked Nadel to stop, Nadel ignored him and continued to enter his office, laugh at the icons, smirk, and make sarcastic comments.

18. In addition to his religious harassment, Nadel also engaged in national origin discrimination against Plaintiff by making repeated derogatory remarks about Romanians. During management meetings, in the presence of employees and consultants, Nadel would tell the same offensive story about Romanians being "like gypsies" and that "in Romania, you have to steal the chicken first, then kill it, then make soup." One of the company's consultants, Peter Wodke, objected to the comments and stated they were inappropriate.

19. Nonetheless, Nadel continued to repeat these comments, subjecting Plaintiff to ongoing humiliation and embarrassment in front of his peers.

20. As Corporate Controller, Plaintiff bore responsibility for ensuring the integrity of Ice Air's financial statements and regulatory disclosures. In the course of performing his duties, Plaintiff discovered and raised concerns regarding several serious financial and regulatory violations, including:

    a. the concealment of over $4 million in liabilities owed to U.S. Customs and Border Protection for tariff violations;

    b. the misuse of corporate funds to purchase luxury vehicles, including a $150,000 BMW titled in Nadel's name, without proper tax reporting; and

    c. the failure to disclose millions of dollars in Department of Energy fines for non-compliant HVAC equipment.

21. When Plaintiff refused to conceal these matters from the company's auditors and lenders, Nadel became increasingly hostile and retaliatory. He frequently yelled at Plaintiff in front

of colleagues and consultants, slammed doors, and verbally attacked him during meetings. In one accounts receivable meeting, Nadel played a "Family Guy" YouTube clip in which a character screams "Where's my f***ing money?" while threatening violence, and he replayed the clip several times while glaring at Plaintiff and laughing.

22. The harassment escalated further when Nadel physically approached Plaintiff with his fists raised and veins bulging in his neck, screaming aggressively. Plaintiff feared for his safety and fled the office. This pattern of intimidation and hostility created a toxic and abusive work environment that caused Plaintiff significant psychological harm.

23. In addition to the above, Plaintiff played a central role in securing the $17.5 million Department of Energy grant for Ice Air's planned manufacturing facility in South Carolina. Despite this major contribution, Defendants retaliated against Plaintiff by pressuring him to conceal from the company's accounting firm approximately $4 million in fines issued by the Department of Energy, along with millions of dollars in liabilities owed to U.S. Customs for misclassifying imported goods. Plaintiff learned that Ice Air had been shifting products "on paper" from China to Hong Kong in an effort to evade duties, tariffs, and taxes, resulting in substantial federal penalties.

24. Defendants further demanded that Plaintiff falsify the audited financial statements by omitting these liabilities because accurately reporting them would jeopardize the DOE-funded factory project and threaten the financing required for its completion. Plaintiff refused to falsify the records or participate in concealing the company's misconduct, which became a significant source of Defendants' retaliation against him.

25. Plaintiff repeatedly reported his distress and sought help, including sending a written email on May 24, 2024, to Nadel and other executives stating that he was in "high distress,"

intended to seek mental health assistance, and that "no employee should experience this again."

26. That same day, Plaintiff formally resigned by letter, citing "unnecessary verbal violence, intimidating body language, and a very loud and harsh tone." He explained that he felt unsafe in the workplace and requested to work remotely to complete his remaining duties.

27. After leaving Ice Air, Plaintiff began treatment with a licensed therapist. His therapist diagnosed him with Post-Traumatic Stress Disorder (PTSD), initially scoring 47 out of 80, which later worsened to 53 out of 80, indicating significant deterioration due to the emotional trauma caused by Nadel's conduct.

28. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, loss of income, and lasting psychological harm. Plaintiff's resignation was not voluntary but was a constructive discharge resulting from Defendants' discriminatory and retaliatory conduct.

## COUNT I

## Religious Discrimination – Title VII of the Civil Rights Act of 1964 and New York State Human Rights Law

29. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

30. At all times relevant hereto, Plaintiff was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f), and the New York State Human Rights Law, N.Y. Exec. Law § 292(6). Defendant Ice Air, LLC was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and N.Y. Exec. Law § 292(5).

31. Plaintiff is a devout Romanian Orthodox Christian who openly maintained symbols of his faith in his workspace, including icons of the Virgin Mary, Father Arsenie Papacioc, and written spiritual materials.

32. 4.   Throughout Plaintiff's employment, Defendant Fredric Nadel, acting individually and as Plaintiff's direct supervisor and the Chief Executive Officer and Chief Financial Officer of Ice Air, engaged in repeated, unwelcome, derogatory, and hostile conduct directed at Plaintiff because of his religious beliefs.

33. Nadel routinely entered Plaintiff's office, pointed at Plaintiff's religious icons, laughed, smirked, and made demeaning comments, including but not limited to: "Who is that old guy in black?" and "Do you believe in that sh*t?"

34. Plaintiff informed Nadel that these comments were offensive, inappropriate, and unwelcome. Despite this, Nadel continued the conduct, returning to Plaintiff's office on multiple occasions to stare at, mock, or make sarcastic remarks about Plaintiff's religious items.

35. The mocking of Plaintiff's religious icons was persistent and became a regular pattern of Nadel's behavior, occurring in both private interactions and in the presence of other employees, thereby magnifying Plaintiff's embarrassment and humiliation.

36. Nadel's conduct was intentional, malicious, and designed to belittle Plaintiff's religious beliefs and create an atmosphere of intimidation, inferiority, and hostility toward Plaintiff's faith.

37. The conduct described herein was severe and pervasive, and it unreasonably interfered with Plaintiff's work performance, psychological well-being, and sense of security in the workplace.

38. Defendants failed to take any steps to prevent or remedy the discriminatory conduct. Plaintiff made clear, verbally and through his distress, that Nadel's actions were unwelcome; however, Ice Air took no corrective or remedial action.

39. Defendants' discriminatory acts were carried out by Nadel, who, at all times relevant, exercised supervisory authority over Plaintiff, meaning that his actions are imputable to Ice Air under Title VII and the NYSHRL.

40. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff experienced emotional distress, humiliation, anxiety, and mental anguish, which required psychological treatment, including therapy for PTSD.

41. Defendants' conduct altered the terms and conditions of Plaintiff's employment and created a hostile work environment based upon Plaintiff's religion.

42. Defendants' actions constitute unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e–2(a), which prohibits discrimination against an employee because of his religion.

43. Defendants' actions further constitute violations of the New York State Human Rights Law, N.Y. Exec. Law § 296(1)(a), which prohibits an employer from discriminating against an individual because of his religious beliefs or practices.

44. As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer lost wages, loss of professional standing, emotional distress, mental anguish, humiliation, and other compensable injuries.

45. The conduct of Defendant Nadel was willful, wanton, malicious, and/or conducted with reckless disregard for Plaintiff's protected rights, entitling Plaintiff to an award of **punitive damages**.

## COUNT II

## National Origin Discrimination – Title VII of the Civil Rights Act of 1964 and New York State Human Rights Law

46. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

47. At all times relevant hereto, Plaintiff was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 292(6). Defendant Ice Air, LLC was an "employer" within the meaning of both statutes. Defendant Nadel was an agent of Ice Air acting within the scope of his authority.

48. Plaintiff is of Romanian national origin, a fact known to Defendants throughout his employment.

49. During Plaintiff's employment, Defendant Fredric Nadel repeatedly made derogatory, humiliating, and demeaning comments about Plaintiff's national origin. These comments were made both privately and publicly, including in management meetings attended by employees and outside consultants.

50. Nadel routinely stated that "Romanians are like gypsies," and repeatedly told a story purportedly from his grandmother about Romanians needing to "steal the chicken first before making soup." These remarks were made in a mocking and sarcastic tone intended to demean Plaintiff's ethnic background.

51. These comments were not isolated. Nadel repeated the same ethnic slurs multiple times in Plaintiff's presence, and Plaintiff was expected to silently endure the derogatory remarks as colleagues and consultants observed the humiliation.

52. On at least one occasion, consultant Peter Wodke objected to Nadel's comments and stated that such remarks were inappropriate, discriminatory, and should not be made in the workplace. Despite this warning, Nadel continued making similar offensive statements.

53. Nadel's ethnic comments were unwanted, offensive, and caused Plaintiff significant embarrassment and distress, particularly because they were voiced during professional meetings and in the presence of Plaintiff's peers and subordinates.

54. Defendants' conduct created a workplace atmosphere permeated with ethnic hostility and ridicule, which altered the terms and conditions of Plaintiff's employment.

55. The repeated and pervasive nature of these remarks fostered an objectively hostile work environment and conveyed that Plaintiff's Romanian heritage made him inferior, untrustworthy, and a target for ridicule.

56. Defendants failed to take any action to prevent or correct the discriminatory conduct, despite being aware of it. Ice Air did not investigate, reprimand, or otherwise address the ongoing harassment.

57. By engaging in the conduct described above, Defendants intentionally discriminated against Plaintiff because of his national origin, in violation of Title VII, 42 U.S.C. § 2000e–2(a), which prohibits employment discrimination based on national origin.

58. Defendants' actions further violate N.Y. Exec. Law § 296(1)(a), which prohibits employers from subjecting an employee to inferior terms, conditions, or privileges of employment because of national origin.

59. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff suffered emotional distress, humiliation, anxiety, loss of income, and other damages.

60. The conduct of Defendant Nadel was intentional, malicious, and carried out with reckless disregard for Plaintiff's federally and state-protected rights, thereby entitling Plaintiff to an award of punitive damages.

## COUNT III

## Retaliation – Title VII of the Civil Rights Act of 1964 and New York State Human Rights Law

61. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

62. At all relevant times, Plaintiff engaged in protected activity within the meaning of Title VII, 42 U.S.C. § 2000e–3(a), and the New York State Human Rights Law, N.Y. Exec. Law § 296(7). Plaintiff opposed conduct he reasonably believed constituted unlawful discrimination and harassment, and he further refused to participate in or conceal unlawful practices within Ice Air, LLC.

63. Specifically, Plaintiff complained—verbally and through written communications—of (1) religious harassment; (2) national origin harassment; (3) hostile work environment conditions; and (4) unethical and unlawful financial practices, including the concealment of multimillion-dollar liabilities, improper financial disclosures, and misappropriation of company assets.

64. Plaintiff's complaints were made directly to Defendant Fredric Nadel, Ice Air's CEO and CFO and Plaintiff's direct supervisor. Plaintiff also notified senior personnel and consultants regarding his distress, including his May 24, 2024 written distress communication, in which he described the abusive conditions and stated that "no employee should experience this again."

65. Plaintiff's protected activity also included his refusal to falsify company records, his insistence on properly reporting liabilities to auditors and lenders, and his statements raising concerns about legal violations related to U.S. Customs, DOE compliance, and tax reporting.

66. Immediately after Plaintiff engaged in protected activity, Defendants retaliated against him by escalating harassment, intimidation, threats, and public humiliation. Defendant Nadel increased the frequency and severity of hostile actions, including screaming, door-slamming, berating Plaintiff in front of other employees, and using threatening gestures.

67. In one particularly severe retaliatory incident, Nadel approached Plaintiff with clenched fists and visible rage, screaming aggressively and causing Plaintiff to fear imminent physical harm. Plaintiff was forced to flee the office during this confrontation.

68. Defendants also retaliated against Plaintiff by creating a more hostile work environment, subjecting him to demeaning conduct during meetings, replaying a threatening and profane "Family Guy" video clip ("Where's my f***ing money?"), and weaponizing it as a form of intimidation directed at Plaintiff.

69. Defendants' retaliatory conduct was deliberate, malicious, and intended to punish Plaintiff for opposing discrimination and for refusing to participate in or conceal unlawful business practices.

70. The retaliation culminated in conditions so intolerable that Plaintiff had no choice but to resign on May 24, 2024. Plaintiff's resignation constituted a constructive discharge, directly caused by Defendants' retaliatory and discriminatory acts.

71. By engaging in the conduct described herein, Defendants violated Title VII**,** 42 U.S.C. § 2000e–3(a), which prohibits employers from retaliating against employees who oppose discrimination or participate in protected activity.

72. Defendants' conduct also violated N.Y. Exec. Law § 296(7), which prohibits retaliation against employees who oppose unlawful discriminatory practices.

73. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered severe emotional distress, loss of wages, loss of professional standing, diminished future earning capacity, humiliation, and other compensable injuries.

74. Defendant Nadel's conduct was intentional, outrageous, and carried out with reckless disregard for Plaintiff's protected rights. Accordingly, Plaintiff seeks punitive damages to deter similar unlawful conduct in the future.

## COUNT IV

## Hostile Work Environment and Constructive Discharge – Title VII and New York State Human Rights Law

75. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

76. Title VII and the New York State Human Rights Law ("NYSHRL") prohibit employers from subjecting an employee to harassment or discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

77. Throughout Plaintiff's employment at Ice Air, Defendants, through the actions of Defendant Fredric Nadel, subjected Plaintiff to ongoing, severe, and pervasive harassment based on his religion, national origin, and protected activity, creating a workplace that was intimidating, abusive, and physically and psychologically threatening.

78. The hostile work environment included, but was not limited to:

(a) repeated mocking of Plaintiff's religious beliefs and sacred icons;

(b) repeated ethnic slurs regarding Plaintiff's Romanian background;

(c) verbal attacks, derogatory comments, and public humiliation in front of colleagues;

(d) screaming, aggressive behavior, and threatening gestures;

(e) replaying a violent and profane video clip meant to intimidate Plaintiff; and

(f) ongoing criticism, belittling, and hostile treatment after Plaintiff raised concerns about discrimination and unlawful financial practices.

79. Defendant Nadel's conduct escalated to physical intimidation, including approaching Plaintiff with clenched fists, raised voice, bulging veins, and threatening posture, causing Plaintiff to believe he was in imminent physical danger.

80. The harassment was not isolated or trivial. It occurred regularly, over an extended period of time, and became a defining characteristic of Plaintiff's daily working environment.

81. Defendants' actions were unwelcome, intentional, and motivated in whole or in part by Plaintiff's protected characteristics and his refusal to participate in unlawful conduct.

82. Ice Air, LLC knew or should have known about the hostile work environment but failed to take any corrective or remedial action. Instead, the company, through Nadel's leadership, perpetuated and intensified the abusive conditions.

83. As a direct result of the hostile work environment, Plaintiff suffered increasing emotional distress, including anxiety, insomnia, and symptoms consistent with trauma. Plaintiff sought psychological treatment and was diagnosed with Post-Traumatic Stress Disorder (PTSD), which worsened during his final months of employment.

84. The conditions at Ice Air became so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign. Plaintiff's resignation on May 24, 2024 was not voluntary, but was a constructive discharge caused by Defendants' discriminatory and retaliatory conduct.

85. By engaging in the conduct described herein, Defendants violated Title VII, 42 U.S.C. § 2000e–2(a), and N.Y. Exec. Law § 296, which prohibit employers from discriminating against an employee with respect to the terms, conditions, or privileges of employment because of religion, national origin, or protected activity.

86. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress, loss of wages, loss of benefits, diminished earning capacity, humiliation, mental anguish, and other economic and non-economic damages.

87. Defendant Nadel's conduct was intentional, malicious, and carried out with reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages under Title VII.

## COUNT V

### Constructive Discharge – Title VII and New York State Human Rights Law

88. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

89. Under Title VII and the New York State Human Rights Law, an employee is considered constructively discharged when the working conditions created by the employer are so intolerable that a reasonable person in the employee's position would feel compelled to resign.

90. Throughout Plaintiff's employment, Defendants engaged in a continuous, escalating pattern of discriminatory, retaliatory, and abusive conduct that rendered Plaintiff's working conditions objectively intolerable.

91. 6The intolerable conditions included:

    (a) severe and pervasive harassment based on Plaintiff's religion and national origin;

    (b) repeated threats, yelling, and verbal abuse by Defendant Nadel;

    (c) physical intimidation, including approaching Plaintiff with clenched fists and threatening posture;

    (d) coercion to participate in or conceal unlawful financial activity;

    (e) public humiliation, mocking, and ridicule in meetings;

    (f) retaliatory treatment following Plaintiff's protected complaints;

    (g) creating a climate of fear, instability, and emotional distress in the workplace.

92. Plaintiff reported his distress and made clear that the conditions were harmful, unsafe, and unacceptable, including sending a written communication on May 24, 2024, stating he was in "high distress," seeking mental-health assistance, and noting that "no employee should experience this again."

93. Rather than take corrective action, Defendants allowed the hostile conditions to persist and intensify, and continued to subject Plaintiff to humiliating and threatening conduct.

94. As a direct result of Defendants' actions, Plaintiff reasonably believed he could no longer safely or effectively perform his job duties and that remaining employed at Ice Air would jeopardize his mental and physical health.

95. On May 24, 2024, Plaintiff resigned from Ice Air. His resignation was not voluntary but was the direct result of Defendants' unlawful and discriminatory conduct, and therefore constitutes a constructive discharge under Title VII and the NYSHRL.

96. Defendants' conduct violated Plaintiff's rights under 42 U.S.C. § 2000e et seq. and N.Y. Exec. Law § 296, entitling Plaintiff to all damages recoverable under those statutes.

97. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered lost wages, lost employment benefits, diminished earning capacity, emotional distress, mental anguish, humiliation, and other compensable damages.

98. Defendant Nadel's conduct was intentional, malicious, and carried out with reckless disregard for Plaintiff's legal rights, entitling Plaintiff to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, George Petre, demands judgment in his favor and against Defendants Ice Air, LLC and Fredric Nadel, jointly and severally, awarding Plaintiff the following relief:

a. Accept jurisdiction over this matter;

b. Declare that Defendants violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law;

c.  Compensatory damages, including damages for emotional distress, pain and suffering, humiliation, loss of enjoyment of life, and all other non-economic harms allowed by law;

d.  Economic damages, including back pay, front pay, lost wages, lost bonuses, lost benefits, diminished earning capacity, and all other financial losses resulting from Defendants' unlawful conduct;

e.  Punitive damages against Defendant Nadel and against Ice Air where permitted by law, due to Defendants' willful, malicious, and reckless violations of Plaintiff's civil rights;

f.  Attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 2000e-5(k) and N.Y. Exec. Law § 297(10);

g.  Pre-judgment and post-judgment interest on all monetary awards;

h.  Reinstatement to his former position, or in the alternative, an award of front pay;

i.  Any and all equitable, declaratory, or injunctive relief that the Court deems just and proper; and

j.  Such other, further, and different relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

**BISCEGLIE & ASSOCIATES, P.C.**
*Attorneys for Plaintiff George Petre*

By: */s/ Angelo R. Bisceglie Jr., Esq.*
    Angelo R. Bisceglie Jr., Esq.
    1527 Franklin Ave., Suite 301
    Mineola, NY 11501

Dated: December 11, 2025